**JUNE TERM 1837.**

ADMINISTRATORS OF WRIGHT v. THOMAS.

Adm'rs of Wright
v.
Thomas.

1. The land book, or "livre terrien," No. 2, made under the authority of the Spanish government, is a public record.
2. Defendant in ejectment derived title under a grant made by Saint Ange, in 1769. It appeared, in evidence, that St. Ange was an agent of the French government, or *commandant*, and after the cession of the ports on the east side of the Mississippi to the British, and on the west side to the Spanish authorities, in pursuance of the treaty of 1762, moved to St. Louis, where, from '66 to '70, his authority as military and civil commandant of that port was recognized by the inhabitants. That he had no authority from the Spanish government, until 1769 when, in conjunction with Piernas, the agent of the Captain General, O'Reilly, the concessions, &c. were resurveyed, and the result recorded in Livre Terrien, No. 2. It moreover appeared that the concession under which the defendant derived title, was not contained in said book.
3. Held, that St. Ange had no authority from the Spanish government to make grants of land, and if his authority to do so was in many instances recognized, or confirmed, by said government, the grant under which defendant claimed, was not among the number so recognized.

*J. Spalding*, attorney for plaintiff in error.

1st. St. Ange had no authority to make the grant; 3 Miss. Dec., page 243, case of Hill and Thomas v. Wright. The case cited was upon the same title as the present, brought by Wright, in his lifetime, against Thomas, and another, whose defence was the same as in this action—Royal Ordinance of 24th August, 1770; also Chouteau's testimony in this case.

Definitive treaty between the Kings of Great Britain, France and Spain, of 10th February, 1763; White's Compilation, 258; Preface to Partedas, page 19; Introduction to Clark's Land Laws, page 5; 9 Peter's Reports; White's Argument. It appears that after the country was ceded to Spain, a *French officer*, from another jurisdiction, removes to St. Louis, and commences granting away the lands of the King of Spain, making, among others, the grant in question.

Acts of Congress of 26th March, 1804, and 2d March, 1805, recognizes the principle in not holding good grants made by Spanish officers after the country was ceded to Spain; Geyer's Digest, 451-2. When the country was ceded, the laws remained the same as to private right, but it did not follow that the king's property could be conveyed away by the agent of a former government.

2d. If St. Ange had any power to grant lands, he could give only an incohate title.—He could act only as the agent of the Governor to designate the land, and make report to the granting authority, of circumstances of the grantee, situation of land, &c., so that the Governor could

act with the proper lights on the subject. See Royal Ordinance of 24th August, 1770; the several acts of Congress respecting land claims in Louisiana; 1 Mar. Rep. 334, (new series) and 4 Mar. Rep. 213 (new series) to the point that these grants were mere donations.

3d. So that St. Ange's act gave only an equity at most, not the title. In order that the title should pass it required the king, the proprietor, or the governor, his agent, for that purpose, to convey it, which act we style a confirmation; 5 Mart. Rep. 35, (new series); Gousonlru's heirs v. Brashear. This case is directly in point on the doctrine above laid down.

4th. The United States succeeded to the Spanish king, and had the same power, and proceeded to perfect these inchoate and imperfect titles, as the king of Spain would have done. In the present case before the court, the title of Labeaume was confirmed, whereby the title was conveyed to him as fully as if the king had confirmed his claim and issued the formal grant. See act of Congress, March 3, 1807; Geyer's Digest, 464, sec. 3d and 5th, page 468, sec. 4; 476, sec. 5; 477, sec. 3; 4 78, sec. 2; also Story's L. U. S. 424, sec. 7; 787, sec. 7; 929, sec. 5; 1201, sec. 10; 899, sec. 12, as to form of patents, &c. After the confirmation to Labeaume, there remained in the United States no title in the land to convey to Labuxiere, had he applied for it, which he did not.

5th. Lands could be re-united to the domain, and regranted; see the testimony showing the acts of Trudeau, &c.; also Leduc's testimony; 6 Peters', 747, and 9 Peters', 742-3.

Taking all the circumstances together in this case, the court is bound to hold that in regard to the land in question, if any incipient title was ever made to Labuxiere, or any equity to it vested in him, it was divested lawfully, and his heirs have no claim.

6th. If any right vested in Labuxiere, the same has been lost by the utter neglect of himself and heirs to file their claim, and notice of the same, according to the acts of Congress; Act of Congress, March 3, 1807; Geyer's Digest, page 464; 6 Peters' Reports, 770-1-2; Authorities (supplemental) Regulations of O'Reilly; Gayoso and Morales; White's Compilation, 204-5-6, &c.; Ordinance of 1754, page 49 and 50, &c., and the laws of the Indies referred to in that ordinance, and in Morales' Regulations; White's Compilation, 38, 39, 40, &c.; Geyer's Digest, p. 465-6, sections 5th, 6th and 7th, to show that the confirmation to Labeaume was *a grant, a passing of the title*

74

to *Labeaume;* section 6 speaks of those confirmations as "*the tracts of land thus granted,*" section 7 speaks of these acts of the commissioners as *final confirmations;* Geyer's Digest, page 475–6, sections 1, 2, 3, and page 478, sections 1 and 2. These citations show that Congress made provision for issuing patents in a multitude of cases, in which the absolute legal title had passed already to the claimants, as was the fact in confirmations under the act of 1807.

*H. R. Gamble,* attorney for defendants in error:

1st. Was this grant made by a person having authority to grant land?

2d. Was it a subsisting title when Louisiana was ceded to the United States, so as to be protected by the treaty?

3d. Has there been any forfeiture of it under any act of Congress?

4th. What is its legal effect as against the subsequent grant and confirmation to Labeaume?

On the question as to St. Ange's authority, see 6 Peters', 727; see the evidence of Chouteau; the evidence from the caption and conclusion of Livre Terrien; see 9 Peters', 137, &c.

On the second question, whether this was a subsisting title at the term of the session; see 9 Peters 133.

On the third question *as to forfeiture under act of Congress.* 1: This was in itself a complete title; see terms of grant. 2: The grant was of record in recorders' office. 3: The acts of Congress do not apply to this grant; see Geyer's Digest 404.

On the 4th question, as to the comparative value of these titles, the appellee insists that his, being a complete title cannot be divested by a subsequent concession and confirmation.

Statement of the case, and opinion delivered by McGIRK, Judge.

Thomas Wright, the intestate, brought an action of trespass against Thomas, for breaking and entering a certain close in the county of St. Louis, near the city of St. Louis, and not guilty was pleaded to it. The cause was tried, and the defendant had judgment. On the trial the plaintiffs gave in evidence a translation of a concession to one Joseph Brazeau, dated 20th June, 1794, which is as follows: "To Don Zenon Trudeau, captain in the fixed regiment of Louisiana, Lieutenant Governor, com-

mandant in chief of the western part of Illinois, humbly prayeth Joseph Brazeau, resident in this village of St. Louis, has the honor to set forth, that he wishes to obtain a tract of land situate to the north of this village, beyond the mound called *La Grange de Terre*, to be four arpens wide, extending from the Bank of the Mississippi west, by south (4° 50′,) by about twenty arpens in length, commencing at the ridge where the said mound stands, and extending towards the N. N. W. as far as Stony Creek, or near it, so that the said tract shall be bounded on the east by the bank of the Mississippi, and on the other sides by the domains of his Majesty, and partly by lands reunited to said domain, over which the present concession actually extends, in order that the petitioner may gather hay therefrom for his cattle, and your petitioner will ever pray, &c.—signed L. Brazeau." Then follows the concession: "We Lt. Gov. and commander in chief of the western part of Illinois, having ascertained that the tract of land asked by the petitioner belongs to his Majesty's domain, part thereof having reverted to said domain, in consequence of the relinquishment of former proprietors, and the other part having never been conceded, and as no one is injured thereby, do certify that the said Joseph Brazeau has been put in possession of the piece of land described in his petition, having four arpens in front, by twenty in depth, which extends N. N. W., from the foot of the ridge whereon the Grange de Terre stands, up to Stony Branch, or near it; bounded on one side by the Mississippi banks, and on the opposite side by land not granted or reunited to his Majesty's domain; and at one end, that is, N. N. W., bounded by the Stony Creek or its vicinity, and towards S. S. E. by the concession granted to a free mulatress, named Ester. In faith whereof, we have given the present in the town of St. Louis, the 10th June, 1794—signed Zenon Trudeau, Lt. Governor." Then follows a grant of the Lieutenant Governor to Brazeau, dated 20th June, 1794. On the 12th May, 1798, Joseph Brazeau made his deed to Louis Labeaume for the tract of land above granted to him; reserving to himself four arpens, to be taken at the foot of the mound, or little hill in the south part of said land, selling to Labaume only 16 arpens in depth. On the 15th February, 1794, Labaume presented his petition to the Lt. Governor, setting forth that he had purchased Brazeau's land, and praying that the Governor would grant to him 360 arpens, including the quantity he had purchased of Brazeau. The boundaries of the land are

JUNE TERM
1837.

Adm'rs of Wright
v.
Thomas:

set forth as follows, (to wit:) twenty arpens in depth from the Mississippi up Stony Creek, W. S. W. by 16 arpens in front along the Mississippi, to begin at the intersection of the road with the Creek, which is the same front with the petitioners land. The space included within the perpendicular from the road to the river, will nearly complete the quantity asked by the petitioner. A copy of a survey made by A. Soulard, surveyor general, was given in evidence, together with the order of the Governor to Soulard, to make the survey and put the petitioner in possession. On the 3rd Sept. 1806, Labaume presented his claim to the U. S. Commissioners for the adjustment of land claims for confirmation, which was rejected. On the 22nd Sept. the board again took up Labaume's claim, and confirmed the same to the extent of 360 arpens, reserving to Brazeau his four arpens reserved by him in his sale to Labaume. It was proved that Labaume, in May, 1800, worked on the tract of land mentioned in the survey—that he dug a ditch around a part thereof—that he built a house about the centre of the tract. A plat of the claim of the plaintiff, and also of the defendant, were given in evidence. It was admitted that in 1816, Labaume sold the tract of land to Chambers, Christy and Wright, the intestate of the plaintiffs, and that subsequently, there was a partition of the land between them; and that the lot now in dispute fell within Wright's share. The possession of the intestate, and the trespass of the defendants as to the land in dispute, were admitted.

The defendant claims, under a concession made to one Labuxiere, in the year 1769, by one St. Ange; which concession, covers the land on which the supposed trespasses were committed. The defendant derives a title by a deed from the heirs of Labuxiere.

The evidence accompanying this concession is a certified copy, made by the recorder of land titles for the State of Missouri, from a paper book called Livre Terrien, No. 1, pages 28 and 29; by which it appears, that on the 18th day of July, 1769, St. Ange and Labuxiere granted or conceded on the demand of the widow Hebert, a title to her and her heirs of a tract of land, two arpens broad, by the ordinary depth of forty arpens, its width fronting on the Mississippi, bounded on the N. by Labuxiere, &c., on certain conditions therein mentioned; also a copy of a concession, taken from Livre Terrien, No. 1, p. 30, read by consent, which is as follows:—Sr. Labuxiere, on the 18th day of July, 1769, on demand

of Sr. Labuxiere, attorney for the King, who has expos-
ed to us that he has no prairie to make hay—that the
land we have granted him between the rivulet of Belle
Fountaine and Stony Run, is barely sufficient to plough;
that we be pleased to grant to him about two arpens of
land, and more, should there be any found which has not
been granted, which are bounded on the one side by the
Stony Run, and on the other side by the land of the wid-
ow Hebert; on the one end or width by the Bluffs of the
Mississippi, and the ordinary depth of forty arpens.—
Thereupon, we have granted and do grant to Sr. Labux-
iere, the said two arpens of land in width, and more,
should there be any found on the depth and manner of
forty arpens, in the same way and manner as above des-
ignated.—Signed St. Ange and Labuxiere.

It was proved by F. R. Conway, recorder of land ti-
tles, that in his office of recorder of land titles, the Livre
Terrien No. 1 and 2 were found, and that he considered
them as authentic records of the grants or concessions of
land made by the former governments of the country.—
M. P. Leduc testified, that he came to St. Louis of the
Illinois, in 1799—that he is conversant with land affairs,
and with the five books called Livres Terriens—that No.
1 of them contains grants of lands made by St. Ange and
Labuxiere—that all the grants in it are signed by both
St. Ange and Labuxiere—that Labuxiere signed on the
right of each grant, and St. Ange on the left—that No.
2 contains surveys of grants of St. Ange, principally in
the St. Louis prairie. It contains the surveys of the com-
mon field lots, going northwardly and including the two
forty arpen lots of the widow Hebert; but that these
two lots are the last on the north—that these surveys
were made by one Duralde, between the years 1770 and
72. Here the witness gives a translation of the survey,
and filed notes of the survey made for widow Hebert.—
The witness further says, that St. Ange was called by
the old inhabitants of St. Louis, the commandant from
1766 to 1770—that the books called Livres Terriens
were in possession of the Spanish government till the
year 1801, when they were delivered officially to the
surveyor Soulard. The witness then has reference to
several surveys found in No. 2, and explains the meaning
of the books, and also refers to a certain marginal note
made by the Lt. Governor, T. Trudeau, in 1793; where-
by it is declared that certain pieces of land before grant-
ed were reunited to the King's domain, because aban-
doned. Witness says he does not know the mode of re-

uniting lands to the domain, but was acquainted with one case, in which the Governor cited the party before he decreed such reunion.

Mr. P. Chouteau testified, that in 1764, he came to St. Louis—that St. Ange was the first commandant of St. Louis; that he continued such commandant ten or twelve years, and died in 1775—that among the old inhabitants, no one doubted that St. Ange was commandant—that he could not write well, but that he could sign his name, and that the signature at the close of L. T. No. 2 is his hand writing—and that the signature purporting to be that of Don Pedro Piernas is Piernas' signature—that Saint Ange came to St. Louis eighteen months or two years after witness did, and after Fort Chartres had been delivered to the British—that St. Ange had been previously military commandant at Vincennes; and when the country east of the Mississippi was to be delivered to the British, St. Ange went to Fort Chartres and surrendered it to the British, and then came to St. Louis—that there was no commandant at St. Louis before St. Ange—he acted as French commandant, and afterwards as civil commandant under the Spanish government until he died; that he was the Spanish civil commandant about 6 years before he died—that he was appointed civil commandant by the Governor at New Orleans, whose name the witness thinks was Unzaga.

Julius De Mun says, he was employed sometime in the office of the recorder of land titles, and that he considered the books *Livres Terriens* public records, and that he believes the government so considered them.

The defendant then gave in evidence the translation of the preface and commencement of the Livre Terrien No. 2, which proceeds thus: "*Register made by me, Martin Duralde, surveyor, appointed by Don Pedro Piernas, captain of infantry, and Lieutenant Governor of the settlements and other dependencies of the Spanish settlements of Illinois, and deposited in the archivee of the said government, in the form of process verbal, in order to serve to designate the different tracts of land granted in the name of the King to the inhabitants of this part of St. Louis, as well by titles as by the verbal consent of the chiefs, who have governed them since the foundation of said post to the present day; which tracts I have surveyed, and which after exchanges, concessions or sales, which the convenience or advantage of each individual may have occasioned, are actually in possession of those hereafter named, according to their own attestation and avowal, and situate in the prairie adjoining said post,*

*in the order and according to the directions detailed as fol-*
*lows."* Here follow some directions for the better un-
derstanding of the entries. Then the book proceeds,
containing entries of surveys of divers tracts of land,
one succeeding another, as contained in book No. 1, as
far north as the two lots of widow Hebert, and there the
entries cease without including the grant to Labuxiere.
The book No. 2 then concludes, as follows: *"I, the un-
dersigned, Martin Duralde, by virtue of power vested in me
by Don Pedro Piernas, captain of infantry, and Lieu-
tenant Governor of the settlements and other parts depend-
ent on the Spanish government of Illinois, at the request of
the inhabitants of this post of St. Louis, asking that the di-
mensions, courses of lines, and boundaries of the lands they
own in the vicinity, be determined by a competent person, au-
thorised to that effect—declare to all whom it may concern,
that, at the request of each of the said inhabitants during
the fall of the year 1770, and the spring of the year 1771
and '72, of which I neither state the months nor days—the
surveys having been made at different times, and not in suc-
cession, in relation to those who have possessions distant
from one another, and situate in various places. And I cer-
tify the same with my signature, and with the unanimous
avowal of all the proprietors assembled at present, with the
approbation of said Don Pedro Piernas in the government
house. In order to serve mutually as witnesses, and affirm
the facts done with their signatures, and others with their
declarations, not knowing how to sign, in presence of Don
Pedro Piernas, the aforesaid Lieutenant Governor, and
Don Louis St. Ange de Bellissime, formerly a captain and
lately a commandant of this said post, both serving (to wit:)
the last named to certify his signature. That in his said
capacity, and by virtue of the power with which he was ves-
ted to have granted either by titles or verbally, the foregoing
described tracts of land, in the name of his Majesty; and the
said Monsieur Piernas, to approve, ratify and confirm.—
Also, with his signature in his capacity of actual Lieuten-
ant Governor, by which he is vested with the same power of
granting the possessions already granted by the said Saint
Ange, and specified in this register, containing sixty eight
written pages—this inclusive, which I deliver in the archives
of this government, in order to be therein preserved forever,
and serve when needed of surety, authenticity and attesta-
tion, in behalf of all therein stated. Signed Martin Dural-
de, Leclede Sigueste Hebert, Dodier A. Conde, Amable Gui-
on, Bequet Sarpy Cotte.*
    *ST. ANGE.*         *PEDRO PIERNAS."*

JUNE TERM
1837.

Adm'rs of Wright
v.
Thomas.

The defendant then gave in evidence, an authenticated extract from the books of the commissioners of land claims under the United States, to shew that the government of the United States had confirmed many of the claims contained in books No. 1 and 2, amounting to eight or more, on the ground of cultivation, possession and inhabitation prior to December, 1803; and also, to shew that the United States had recognized the acts of St. Ange as a legal officer to grant land in 1769. The defendant also gave evidence, by one Rene Dodier, who says he is 65 years old—he knows that Joseph Labuxiere cultivated land south of Rock Creek, and north of Madame Hebert eight, nine or ten years; he cultivated land there both before and after the massacre, which was in 1780—his father owned a piece of land near Labuxiere—witness thought himself on Labuxiere's land—Labuxiere cultivated he should think, eight or nine arpens—there was no enclosure about it, except the common field—says he worked with Labaume's hands on the land, fifty-five years ago. One Revere says he is eighty-eight years old—knows that Labuxiere cultivated land south of Rock Branch, between the road and the River, sixty-four or sixty-five years ago, and continued to do so until the Indians scared him away; he cultivated some fifteen acres, and raised wheat and corn on it—says it is about forty-two or forty-three years since he first heard of Labuxiere's death; says Labuxiere went to Cahokia three or four years after the massacre.

The following facts were admitted, and not in dispute on the trial:

That Joseph Labuxiere, aforesaid, died at Cahokia in Illinois, April 29th, 1791; that he left heirs, now living in Missouri and Illinois, and that the defendants have acquired, by purchase of said heirs, all the right and title which Labuxiere had in the lands in question, at his death, which may not have been forfeited or abandoned.

The defendant offered, in evidence, a general notice, by several citizens of St. Louis, for the benefit of all parties concerned, given to the register of land claims, to be recorded, contained in "Livre Terrien," No. 1, 2, 3, 4, 5, 6; signed by several citizens, dated November 28th, 1812.

This suit was commenced in 1831, and tried on the 27th July, 1836. The foregoing statement contains the principal part of the evidence of any importance in the cause, on which the parties had a trial by jury. A verdict and judgment were given for defendant.

The defendant, by his counsel, asked the court for the following instructions to the jury:

JUNE TERM
1837.

Adm'rs of Wright
v.
Thomas.

1st. That St. Ange had power to make the grant in favor of Labuxiere, which the defendant has given in evidence as the foundation of his title.

2d. That the books, numbered one and two, called Livres Terriens, or provincial land books, in the office of the recorder of land titles, are public records.

3d. That there is no evidence that the grant to Labuxiere has been annulled, which were given to the jury.— The court, then, without the requisition of either party, instructed the jury.

1st. If the jury shall be of opinion that the date of the grant to Brazeau on the ___ day of ___, 1794, Labuxiere had abandoned the land they shall find for the plaintiff, provided, they shall find that the land in question is included in the grant to Brazeau.

2d. If the jury shall be of opinion that the date of the grant to Labeaume, viz: 15th day of February, 1799, Labuxiere had abandoned the land granted to him, they shall find for the plaintiff, provided the jury shall find that the land in question is included in the grant to Labeaume.

3d. The grant to Labuxiere, given in evidence, is not a complete grant, or title properly so called, but only gives an estate in fee to Labuxiere subject to the action of the supreme power, which, at the date of said grant, was vested in the King of Spain, or the Governor General of Louisiana, to the giving of which the plaintiff excepts. The plaintiff's counsel then prayed the court to give the following instructions:

1st. That if the jury believe from the evidence that Labuxiere abandoned the land on which the said alleged trespasses, were committed with an intention of never reclaiming it, then the title to it has been acquired by the defendant in this action.

2d. That if the jury believe from the evidence that Louis Labeaume and those claiming under him were in possession of the *locus in quo* for twenty years previous to the 17th of December, 1818, that then any title under the grant to Labuxiere has been lost by his representatives, and cannot be a bar to this action, provided that they are of opinion that the *locus in quo* is embraced in the grant to Labeaume.

3d. That if Labeaume and those claiming under him were in actual possession of a part of the grant to him by Trudeau, claiming the whole all the time aforesaid, this is such possession as can be a basis of prescription as to the whole grant, and gave to Labeaume and those claiming under him, a title as against those claiming under Labuxiere.

75

JUNE TERM
1837.

Adm'rs of Wright
v.
Thomas.

4th. That if the jury believe from the evidence that Louis Labeaume and those claiming under him were in actual possession of a part of the grant to him by Trudeau, claiming the whole for, and during, twenty years, and subsequent to the date of said grant. This is such possession as can be a basis of prescription as to the whole grant as against Labuxiere and those claiming under him. The first was given, and the others refused and excepted to.

A motion was made for a new trial for the following reasons: 1. The court refused to give instructions as asked. 2. The court instructed the jury impropeily and illegally. 3. Because the instructions of the court had a tendency to confuse and mislead them. 4. Because the verdict is against law and evidence. 5. Because the verdict is against the weight of evidence. 6. Because the verdict is against the instructions of the court. 7. Because the court permitted improper evidence to go to the jury—which motion was overruled.

The counsel for the plaintiffs in error, have assigned for error, that the court erred in giving the instructions which it did give. 2. The court erred in giving the instructions asked by the defendant. 3. The court erred in refusing to give the instructions as asked by the plaintiff. 4. The court erred in refusing a new trial.

The counsel on both sides have made several points, but both parties appear to consider the point raised by the first instruction given by the court for the defendant as the chief point to be considered. The instruction is, that St. Ange had power to make the grant which was given in evidence. In the case of Hill and Thomas vs. Wright, decided by this conrt, 3 vol. Missouri Rep. 243, it was holden by the court that as the record then stood, there was no evidence to satisfy the coúrt whether the Livre Terrien was a public record or not, and some proof ought to be given to show, and satisfy, the court, whether the Livre Terrien is itself a record or not.

The land book, or
"livre terrien,"
No. 2, made un-
der the authority
of the Spanish
government, is a
public record.

Defendant in
ejectment derived
title under a grant
made by Saint

But now we think that defect of testimony has been abundantly supplied, and that it now appears that the book No. 2 is in truth the record of the surveys of the Spanish government in regard to lands, but that the book called No. 1 does not appear to stand on the same favorable footing. The instruction given asserts that St. Ange had power to make the grant given in evidence by the defendant. It appears from various histories regarding the political condition of the French possessions of the Mississippi, that prior to the year 1762, the French authority

prevailed, and actually existed, on the east and west sides of the Mississippi, especially in the countries now included in the States of Illinois and Missouri. That on the 3d of November, 1762, France ceded that east of the Mississippi, to Great Britain, and that west, to Spain; and that on or about the 23d March, 1764, these treaties were made public. That on these treaties becoming public, a portion of the French inhabitants on the east side of the Mississippi, living at Cahokia and at Fort Chartres, abandoned their habitations, unwilling to live under British authority, and preferring the Spanish authority, or, as they supposed, the French authority—transferred themselves to the west of the Mississippi, and established the post of St. Louis.—This establishment was undoubtedly made without the leave of the Spanish government. From the date of the treaty, 1762, the French crown never, as far as I can discover, in any instance, attempt to exercise any authority, of any kind, west of the Mississippi. The inhabitants being discharged from all obligation to France, had no legal political government, till August, 1769—(see introduction to 1 Partidas, 19), when Count O'Reilly, under the authority of the Spanish King landed at New Orleans at the head of 3000 troops, and took possession of the country. The reason why this delay of the Spanish government to take possession of her lately purchased territories took place, will be found in the distracted condition of the Spanish monarchy—occasioned by a distressing war, in which it was lately engaged; and also, in the rebellious disposition of the inhabitants of Louisiana. During this *interregnum*, whatever might by the law of nations be the political and civil condition of the inhabitants of the country residing therein at the cessation of French authority, it seems to me quite clear that the subjects of Great Britain, who established themselves at St. Louis in 1764, had no legal government at all.

It appears by the testimony of Mr. Pierre Chouteau, sen., a gentleman of intelligence, and entitled to great credit, that in the year 1764 he first came to St. Louis, and by his testimony it appears that the first knowledge he had of St. Ange, he was captain of the French military post on the Wabash, called Vincennes. That when the country east of the Mississippi was to be delivered to the British government, St. Ange went to Fort Chartres a French military post, on the east side of the Mississippi, and made the delivery of that post to the British authority, and then came to St. Louis. That before the arrival of St. Ange at St. Louis, there was no command-

Ange, in 1769. It appeared in evidence, that Saint Ange was an agent of the French government, or *commandant*—and after the cession of the ports on the east side of the Mississippi to the British, and on the west side to the Spanish authorities, in pursuance of the treaty in 1762, moved to St. Louis, where, from '66 to '70, his authority as military and civil commandant of that port was recognized by the inhabitants. That he had no authority from the Spanish government until 1769, when, in conjunction with Pietnas, the agent of the Captain General, O'-Reilly, the concessions, &c., were resurveyed, and the result recorded in Livre Terrien, No. 2. It moreover, appeared that the concession under which defendant derived title, was not contained in said book. Held, that Saint Ange had no authority from the Spanish government to make grants of land, and if his author-

JUNE TERM
1837.

Adm'rs of Wright
v.
Thomas.

ity to do so was in
many instances
recognized, or
confirmed by said
government, the
grant under
which defend-
ant claimed, was
not among the
number so recog-
nized.

er—that he came to St. Louis eighteen months after the witness, that is, he came there in 1766; and that St. Ange acted as French commandant at St. Louis, and after-wards as civil commandant under the Spanish government till he died in 1775—and that he was appointed civil commandant by the Governor at New Orleans, whose name the witness thinks was Ungaza. From the historical facts connected with the transactions of the country, and from the testimony on the record, it is apparent to me that St. Ange, when he made the grant to Labuxiere, had not one particle of authority to do so. The first founders of St. Louis had no government at all, other than such as was voluntary.

Mr. Chouteau says that St. Ange was the first commandant. He could not have brought any authority with him from the dominions of Great Britain. When he surrendered the French garrison of Fort Chartres to the British, his authority then ceased, and he could have none any where as a French officer, except in countries where the French authority still subsisted. But instead of placing himself in such country, he chose to follow his friends, countrymen and acquaintances into the dominions of a foreign government. It was natural for the inhabitants at this newly established post of St. Louis to look to St. Ange as the most suitable man among them, as the head of their infant colony. They had seen him before exercising the government of the country on the other side of the River, and would be easily persuaded to submit to his will. St. Ange assumed the reins of government here by consent of the people, in the patriarchical form, and not as the representative of the sovereign of Spain, to whom the country belonged. It is difficult to perceive how St. Ange could have any authority from Spain—he had never been an officer of that government; when he came to St. Louis he was not an officer at St. Louis left in command of that post, when the French authority ceased to exist in the country. When St. Ange made the grant to Labuxiere in July, 1769, he had no other character than that of a private citizen of some influence and distinction, by reason of his former condition under the French government. Indeed, he assumes to himself no title,—does not assume to act in the name, nor by the authority of any government whatever. It is impossible for me to suppose that this stranger from a foreign government, had any confidence reposed in him at this distant point to dispose of the King's domain. When the King's authority had as yet been contemned and de-

spised by the inhabitants, and had not yet entered the country, but had to be forced in about a month thereafter, under the influence of the three thousand Spanish muskets, in the hands of so many veterans of the Royal army, commanded by a person of no less distinction than Count O'Reilly, Lieutenant General of the armies of his Majesty, and captain general of the province of Louisiana;—see introduction to 1 Partidas, 18 and 19. When O'Reilly took possession of the country, 27th August, 1769, after putting to death a sufficient number of the inhabitants of New Orleans to ensure no more resistance to the government of his King, he established the authority of Spain in Louisiana, as appears by his proclamation of 25th Nov. 1769. By the Royal ordinance of the King of Spain of 24th August, 1770, it is recited that by the form of the French government in Louisiana, the Governor and Commissary could grant land, and that henceforth the Governor alone has the power to do so. As was said by this court in the case of Hill & Thomas vs. Wright, this ordinance shews that the King of Spain and O'Reilly were of opinion, that the land granting power under the French government, only belonged to the Governor and Commissary, and there is no sort of evidence that Saint Ange ever held either of those places.

When the Spanish authority and government reached the post of St. Louis under Don Pedro Piernas, we find that officer and the inhabitants of opinion that the acts of St. Ange were of no legal value. It appears by the commencement and conclusion of the book of land surveys, called Livre Terrien, No. 2, as given in evidence by the defendant, that the inhabitants solicited that the then Spanish Governor would appoint some competent person to mark out their lands that were granted, and had been and should be granted in the name of the King.— This application was made sometime in the year 1770— one Duralde was appointed to make the surveys, and he did so. The book of these surveys constitutes what is here called Livre Terrien No. 2, and in the conclusion of that book, it is expressly stated, that the surveyor authenticates the same with his signature and with the unanimous voice of all the proprietors assembled at present, with the approbation of Don Pedro Piernas, in the government house—in order to serve mutually as witnesses, and affirm the facts done with their signatures, and in presence of Don Pedro Piernas, the aforesaid Governor, and Don Louis St. Ange, formerly a captain, and lately commandant of this said post, both serving (to wit:)

JUNE TERM 1837.

Adm'rs of Wright
v.
Thomas.

the last to certify his signature; that in his said capacity, and by virtue of the power with which he was vested, to have granted either by letters or verbally, the foregoing described tracts of land in the name of his Majesty, and the said Piernas to approve, ratify and confirm; also, with his signature in his capacity of actual Lieutenant Governor, by which he is vested with the same power of granting the possession already granted by said St. Ange, and specified in this register, which is delivered in the archives, to serve for surety and evidence of all therein stated.

I consider this as evidence, that St. Ange acknowledged that whatever he did before the arrival of the Governor, was done in the name of the Spanish King, and not in the name of the King of France. It was in fact giving in his adhesion; and the Governor, so far from thinking that St. Ange's grants were legal and done with lawful authority, must have had a contrary opinion, or why would he ratify, approve and confirm the same. Whatever may be the effect of this ratification on all the surveys contained in this book of 68 pages, it can have no effect on the grant to Labuxiere, for that grant is not one contained in the book. Why it was not surveyed and registered we cannot know. It is very probable that Labuxiere did not desire it, and cared nothing about it; and the claim has been entirely neglected until about the time of bringing the action in ejectment, by Hill & Thomas vs. Wright, in 1831. I have shewn that Labuxiere's supposed grant could not have been made by St. Ange, even if the French government had subsisted in the country at the time it was made. By the Royal ordinance above referred to, that power under the French government was vested in the Governor and Commissary; whereas, to make the most of St. Ange's power, he was only, as the evidence discloses, formerly a captain, and lately a commandant of the post of St. Louis, and as such commandant of the post, he had in my opinion, no power to grant lands under any government. I therefore, am of opinion, that this claim is of no avail against Labeaume's subsequent grant of the same land, made by the proper officer, and duly confirmed by the American government.

This opinion is further strengthened by the fact, that in 1798, Zenon Trudeau granted the same land to Labeaume. This shews that the Spanish government and the Spanish Governor considered the grant to Labuxiere of no value. The book No. 1, was in his office,—he must have known of the grant, and the book No. 2, was also

before him, he could see that this grant was not among those ratified;—he might therefore well say it never was granted, or if so, for want of confirmation was as if it never had been granted. Trudeau had the best means of knowing how the Spanish law regarded the grant.

For these reasons, I am of opinion that the first instruction given by the court, on the prayer of the defendant in the court below, was wrong.

There are many other points made by the record, but I consider it entirely unnecessary to investigate them until it can be established that Labuxiere's grant had some effect in creating or passing to him the original title of the King of Spain to the land.

Judge Tompkins concurring in this opinion, the judgment of the circuit court is reversed, and the cause remanded for a new trial.

Tompkins, Judge. I concur in the above written opinion.